### Kravitz Estate.

Argued April 29, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Desmond J. McTighe,* with him *Philip D. Weiss,* and *Duffy, McTighe & McElhone,* for appellant.

*Morris Passon,* with him *Leon H. Fox,* for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, June 30, 1965:

May a convicted slayer relitigate in the Orphans' Court the issue of murder and the question of his guilt?

Ethel Kravitz, the appellant, was indicted for the murder of her husband, Max Kravitz, in their home in Wynnewood, on July 4, 1958. She pleaded not guilty; she was found guilty of murder in the second degree by a jury on December 12, 1958, and on July 17, 1959, she was sentenced to an indeterminate sentence in the State Industrial Home for Women at Muncy, Pennsylvania. On June 28, 1960, this Court in *Commonwealth v. Kravitz*, 400 Pa. 198, 161 A. 2d 861, affirmed the judgment and sentence.

Max Kravitz left surviving him, his widow Ethel Kravitz, a brother Harry Kravitz, and a sister Esther Passon. Kravitz left a will in which he bequeathed his residuary estate to his wife if she survived him by ninety days. Having so survived him, she presented her claim to her husband's residuary estate at the audit of his executor's account. Her claim was disallowed and dismissed in a learned Opinion by President Judge TAXIS.

Ethel Kravitz did not testify in the criminal case in which she was convicted of murdering her husband. However, in the present case she offered (a) to take the witness stand in support of her claim, and (b) to testify that she was innocent of the murder of her husband, and (c) to support her claim of innocence by the testimony of additional witnesses. The auditing Judge (1) refused to permit the question of her guilt or innocence to be relitigated, and (2) held that the finding of the jury and the sentence of the Court in the above mentioned case of *Commonwealth v. Kravitz* was *conclusive of her guilt,* and (3) that under the Slayer's Act of August 5, 1941,* she was not entitled to any part of her husband's estate which had been bequeathed to her in his will.

The exact questions presented by this appeal have never been specifically decided in Pennsylvania. Be-

* P. L. 816, 20 P.S. §3442.

fore analyzing the language of the pertinent Act of August 5, 1941, we shall first discuss prior cases and the reasons for the enactment of the 1941 Act.

In *Carpenter's Appeal,* 170 Pa. 203, 32 A. 637, a son had murdered his father for the purpose of securing his estate. Nevertheless, the Court allowed the son to inherit his father's estate on the ground that the crime did not destroy his right to inherit under the then existing Intestate Act. Thereafter, the Legislature passed the Intestate Act of June 7, 1917,* which, in §23, prohibited a person "who shall be finally adjudged guilty of murder" from inheriting (under certain circumstances) any part of the estate of the person killed. This Act was interpreted in *Tarlo's Estate,*\*\* 315 Pa. 321, 172 A. 139, to mean that where a father murdered his wife and daughter and then took his own life, his heirs could inherit through him his daughter's estate *because the father had not been "finally adjudged guilty of murder."* As the result of the decision in *Tarlo's Estate,* the Legislature repealed §23 of the Intestate Act of 1917, and enacted the *Slayer's Act of August 5, 1941.*

The pertinent provisions of the Act of 1941 are as follows: Section 2. "No slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but such property shall pass as provided in the sections following."

Section 14. "The record of his conviction of having participated in the wilful and unlawful killing of the decedent shall be admissible in evidence against a claimant of property in any civil action arising under this act."

Section 15. "This act shall not be considered penal in nature, but *shall be construed broadly in order to*

---

* P. L. 429.

\*\* By a divided Court of 4-3.

*effect the policy of this State that no person shall be allowed to profit by his own wrong, wherever committed."*

It will be instantly noted that there is no *express* provision in the Act of 1941 covering the specific question whether a person convicted of murder can relitigate the issue (a) of the crime, or (b) of his (or her) guilt or innocence thereof, in a proceeding in the Orphans' Court to determine the distribution of the decedent's estate. From the failure of the Slayer's Act to expressly cover this question, appellant and appellee reach exactly opposite conclusions.

## Public Policy and Recent Analogous Cases

The trend of the law in Pennsylvania—both statutory and decisional, as well as the public Policy of our Commonwealth—is clear.

In *Commonwealth v. Evans,* 399 Pa. 387, 389, 398, 160 A. 2d 407, James F. Torrance was convicted** of misbehavior in office and of conspiracy to defraud the Commonwealth of Pennsylvania in connection with the construction of a part of the Northeastern Extension of the Pennsylvania Turnpike. After Torrance's conviction, the Turnpike Commission brought an action of assumpsit against the surety to recover $300,-000 because of Torrance's participation in the conspiracy to defraud the Commission and his failure to faithfully perform his duties. Torrance had given two bonds, one in his capacity as a member of the Pennsylvania Turnpike Commission and the other in his capacity as Secretary-Treasurer of the Commission. In each of these bonds the United States Fidelity & Guaranty Co. was surety, and bound itself unto the Commission for the faithful performance by Torrance

---

* Italics throughout, ours.
** By a sharply divided Court.

of the duties required in his performance of the aforesaid offices. In that case, namely, *Pennsylvania Turnpike Commission v. United States Fidelity and Guaranty Co.,* 412 Pa. 222, 194 A. 2d 423, this Court* held that the record of the criminal proceedings against Torrance was admissible, and that the judgments of conviction entered against Torrance were *conclusive* as to the defendant's liability for the face amount of the bonds. The Court said (pages 225, 226, 227 and 228):

"In their answers to the complaint, Torrance and Fidelity specifically *denied* the existence of the conspiracy to defraud, and misbehavior in office, and that the former had breached the conditions of the bonds; also that the conviction of Torrance was *conclusive* of their liability. . . .

## "Import of the Criminal Judgments

"The rule in most jurisdictions is that a judgment entered in a criminal case is not proof of anything in a subsequent civil action growing out of the same facts, except the fact of its rendition. See 50 C.J.S., Judgments §754; 30A Am. Jur., Judgments, §472, and 2 Freeman, Judgments, §653 (5th ed. 1925). The rule is a carry over from the early days of the common law. See 18 A.L.R. 2d 1287. With the lapse of time, it has been recognized that the reasons for the rule are weak and outdated. A growing minority would admit the criminal record as evidence of the facts determined in the criminal proceeding unless it is excluded by statute. See, Developments in the Law Res Judicata, 65 Harv. L. Rev. 818 (1952); Schindler v. Royal Ins. Co., 258 N.Y. 310, 179 N.E. 711 (1932), and 18 A.L.R. 2d 1287 and 1289. The federal courts have

---

* In a unanimous Opinion by the six Judges who sat in that case.

now adopted a progressive view and hold that the issues essential to a guilty verdict must be regarded as having been determined by the judgment. See, Local 167, I.B. of Teamsters v. United States, 291 U.S. 293 (1934); United States v. Gramling, 180 F. 2d 498 (5th Cir. 1950); United States v. Salvatore, 140 F. Supp. 470 (1956); United States v. Doman, 255 F. 2d 865 (3rd Cir. 1958), aff'd 359 U.S. 309 (1959).

". . . in Mineo v. Eureka Sec. F. & M. Ins. Co., 182 Pa. Superior Ct. 75, 125 A. 2d 612 (1956), it was held that the named insured in a fire insurance policy or his assignee was *conclusively barred* from recovery on the policy by the conviction of the insured on the charge of arson. Also, it has been held that *a person convicted of murder cannot take as beneficiary under an insurance contract on the life of the victim.* See, Greifer's Estate, 333 Pa. 278, 5 A. 2d 118 (1939).

. . .

"The question of the involvement of Torrance, the principal on the bonds, in a conspiracy to defraud and misbehavior in office, was thoroughly explored in a long and well conducted trial. The convictions which followed necessarily established that Torrance participated in a conspiracy to defraud the commission, and that he wilfully permitted payment of vast sums of money to Manu-Mine to which it was not entitled.

. . .

". . . we therefore conclude, that the breach of the conditions of the bonds has been established."

In *Greifer's Estate,* 333 Pa., supra, the Court held that a wife who was convicted of the murder of her husband could not claim the benefit of the policies of insurance upon her husband's life which were a part of an inter vivos trust created by him for her benefit. Justice (later Chief Justice) SCHAFFER, speaking for a unanimous Court, distinguished *Carpenter's Estate,* 170 Pa. 203, 32 A. 637, and *Tarlo's Estate,* 315

Pa., supra, and said (page 279) : ". . . She is barred by the common law principle that a person will not be permitted to profit by his own wrong, particularly by his own crime: Robinson v. Metropolitan Life Ins. Co., 69 Pa. Superior Ct. 274; Cleaver v. Mutual Reserve Fund Life Assn. [1892], 1 Queen's Bench 147; Schmidt v. Northern Life Assn., 112 Ia. 41, 83 N.W. 800; Smith v. Todd, 155 S.C. 323, 152 S.E. 506; Mutual Life Ins. Co. v. Armstrong, 117 U.S. 591; Slocum v. Metropolitan Life Ins. Co., 245 Mass. 565, 139 N.E. 816. For complete citation of cases, see 70 A.L.R. 1539; 91 A.L.R. 1486. We imagine it would not be contended that the murderess could take under the policies of insurance if she had been directly named as beneficiary therein, instead of indirectly through the deed of trust."

*Pennsylvania Turnpike Commission v. United States Fidelity and Guaranty Co.,* 412 Pa., supra, was followed and approved in *Hurtt v. Stirone,* 416 Pa. 493, 206 A. 2d 624. In that case an action of assumpsit was brought by an employer to recover money extorted from him by defendant. *The Court directed a verdict for plaintiff.* The Court specifically ruled that since defendant has been convicted in a Federal Court of violating the Hobbs' Anti-Racketeering Act as a result of the money payments to defendant involved in the present civil action, the record of defendant's conviction was properly admitted in evidence and *conclusively* established the fact of defendant's extortion. The Court said (page 498) : "The same principles of public policy enunciated in Mineo, supra, and Pennsylvania Turnpike Commission, supra, apply with equal force to the present case. The defendant was presented with more than ample opportunity to overcome the charges lodged against him while he was swathed in a cloak of presumed innocence. His case was twice presented to a federal jury which found him

guilty of extortion beyond a reasonable doubt, upon the same facts which are now urged as the basis for his civil liability. To now hold that the effect of those jury determinations is nil not only would be to fly in the face of reason, but also *would be a general indictment of the whole American jury system."*

The Slayer's Act of 1941 enunciates not only sound law, but *wise public policy.* As we have seen, it specifically provides (a) that "No slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent" and (b) that "This act shall . . . be construed broadly in order to effect the policy of this State that no person shall be allowed to profit by his own wrong, wherever committed" and (c) "The record of his conviction of having participated in the wilful and unlawful killing of the decedent shall be admissible in evidence against a claimant of property in any civil action. . . ." The intent of the legislature and the language of the Slayer's Act are, we believe, clear—a person convicted of murder is not entitled to receive any property of the person he (or she) wilfully or unlawfully killed.

Our conclusion is further strengthened by §6 of the Intestate Act of April 24, 1947, P. L. 80. Section 6, Forfeiture—subsection (c) provides: "(c) Slayer's share. Any person who participates either as a principal or as an accessory before the fact in the wilful and unlawful killing of any person shall not in any way acquire property r receive any benefits as the result of such killing but such property or benefits shall be distributed as provided by law."

The Commission's comment provides: Subsection (c). "This subsection overlaps some of the provisions of the 'Slayer' Act of 1941, P. L. 816, 20 P.S. §§3441-3456. It is not intended to supplant the provisions of the Slayer Act, but is included here for completeness

and to avoid any suggestion of partial repeal of the Slayer Act."

The interpretation of the Slayer's Act advocated by appellant, namely, that after a conviction of murder and judgment and sentence thereon—proved not as in civil cases by a fair preponderance of the evidence, but by evidence beyond a reasonable doubt—the issue of "murder" and of "the guilt or innocence" of the convicted slayer can be relitigated anew by a jury in the Orphans' Court or in a civil action in any other Court, would make a mockery of the law and of Justice.

One other point remains for consideration—What does §14 of the Act of 1941 mean by "the record of his conviction"? The Slayer's Act of 1941 provides, as above noted, that the *record* of Mrs. Kravitz's conviction of having participated in the wilful and unlawful killing of the decedent, shall be admissible in evidence in considering and disposing of her claim to her husband's residuary estate. The correct rule in these "Slayer" cases is that the record of her conviction includes the indictment, the verdict of the jury, the judgment and sentence of the Court, and any decision, order and judgment of this Court and of the Supreme Court of the United States. It is obvious that the interests of Justice, as well as long established practice, would make all of the aforesaid a part of the record. Cf. *Commonwealth ex rel. McClenachan v. Reading,* 336 Pa. 165, 169, 6 A. 2d 776.

Considering the above-mentioned analogous cases and considering especially the language of the Slayer's Act of 1941, and the reasons for its enactment, its principal purpose and objective and the wise and salutary public policy which it proclaims—we have no doubt of the legislative intent and of the proper construction of the Act.

We therefore specifically rule (1) that the *record* of conviction and judgment of sentence of Ethel Kra-

vitz for the murder of her husband, is not merely prima facie evidence thereof, but is a *conclusive bar* to her right to take under or against her husband's will, and (2) that neither the question of "murder" nor her guilt or innocence of the crime can be relitigated in the Orphans' Court.

Decree affirmed at appellant's cost.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

In *Hurtt v. Stirone,* 416 Pa. 493, 206 A. 2d 624 (1965), I dissented to the majority's development of a *common law* rule of evidence that when a criminal conviction is introduced into a civil proceeding it *conclusively proves* in the civil proceeding facts which must necessarily have been established in the criminal proceeding, even though there is no substantial identity of parties. The rule set forth in *Stirone* is diametrically opposed to *Zubrod v. Kuhn,* 357 Pa. 200, 53 A. 2d 604 (1947), where a criminal conviction of assault and battery was held *inadmissible* in an action to recover civil damages for the same assault and battery; and it is far more extreme than the rule of a growing minority of courts that the conviction is admissible as some *evidence* of the facts established by it when introduced in a civil proceeding to prove the same facts. The rule of conclusiveness in *Stirone* is unjust because it unduly emphasizes the policy of diminishing litigation. It does not sufficiently take into account the fallibility of juries, advocates and judges involved in any proceeding. Further, only the criminal is bound by the "truth" established in the criminal proceeding; I do not understand the majority here or in *Stirone* to suggest that an acquittal in the criminal proceeding conclusively establishes the facts upon which it is based when introduced in a civil proceeding not involving the same parties. In other words, with respect to its effect on future separate causes of actions

between different parties, the criminal proceeding is a one-way street against the interests of the defendant; any error in finding the "truth" is conclusive in the future only if the "truth" is adverse to the defendant.

But, regardless, of the correctness of *Stirone,* that case is not applicable here. In this case we are not dealing with Pennsylvania's *common law* rules of evidence but, instead, with a *statutory provision* which regulates use of certain specified items of evidence in a proceeding to determine the right of inheritance— a subject entirely regulated by statute. The Slayer's Act of 1941 provides that "[n]o slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent. . . ."[1] It defines a "slayer" as one "who participates, either as a principal or as an accessory before the fact, in the wilful and unlawful killing of any other person".[2] Section 14 of the Act provides: "The *record* of his conviction of having participated in the wilful and unlawful killing of the decedent shall be *admissible in evidence* against a claimant of property in any civil action arising under this act." (Emphasis supplied.)

It is plain that the Legislature did not *say* the conviction was conclusive. It said it was evidence. Nor did the author of this provision believe that, under it, the record would be conclusive; and his views were well known. Wade, Acquisition of Property By Wilfully Killing Another—A Statutory Solution, 49 Harv. L. Rev. 715, 750 (1936). Nor have Pennsylvania commentators thought that, under this provision, the conviction was conclusive. See 17 Pitt. L. Rev. 494, 498 (1956); 46 Dick. L. Rev. 99, 101 (1941).

Besides ignoring the obvious import of the language, the majority recites the legislative history but

---

[1] Act of August 5, 1941, P. L. 816, §2, 20 P.S. §3442.
[2] Id., §1(1).

fails to perceive its impact upon the task of interpreting the statutory provision which controls this case. Up to the time of the enactment of the Slayer's Act of 1941, the Intestate Act of 1917 had provided that a person "who shall be finally adjudged guilty of murder" of the decedent could not inherit from him; and in *Tarlo's Estate,* 315 Pa. 321, 172 Atl. 139 (1934), we held that this provision meant that if the claimant had not been criminally convicted of the crime he could not be barred from inheriting. Obviously, therefore, under the 1917 statute the *only* way to prove that the claimant was barred as a slayer was to introduce his conviction into Orphans' Court. The common law, at the time when the 1941 Act was passed, provided that a criminal conviction was inadmissible in civil proceedings for purposes of proving facts established in the criminal proceeding. *Zubrod v. Kuhn,* supra. The Slayer's Act of 1941 was designed to change the rule of *Tarlo's Estate,* permitting the fact of the claimant's involvement in decedent's death to be established in Orphans' Court for purposes of determining his right to inherit, rather than requiring a criminal conviction. The question remained regarding the weight to be given to a prior criminal conviction where one existed. Confronted with two clear alternatives of making it *conclusive,* as under the 1917 Act, or *inadmissible* as under the common law, the Legislature chose a third alternative in §14, to make it merely *"admissible in evidence".* Thus, it codified the rule that the conviction is admissible but not conclusive on the question of whether one is a slayer for purposes of inheriting; and the ultimate fact is to be determined in orphans' court.

The majority's view that §14 is *silent* on the weight to be attributed to the conviction ignores the language and the history of the section and frustrates the legislative purpose to make the orphans' court the fact finding tribunal for purposes of inheritance, rather

than the criminal courts as was true under the 1917 Act. Moreover, in relying on common law cases rather than solely on the statute, the majority assumes unto the courts the regulation of the right to inherit—a matter that had always been thought to be strictly within the province of the Legislature. *Carpenter's Appeal,* 170 Pa. 203, 32 Atl. 637 (1895); *Tarlo's Estate,* supra. In those cases we strictly applied the statutory law leaving it to the Legislature to change that law if it so desired. We should do the same here.

I dissent.

Mr. Justice MUSMANNO joins in this dissenting opinion.